CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
March 02, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Timothy Willett and Willett Exterior Services LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| Counterclaim- | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25-cv-00044 |
| | ) | |
| Window Gang, LLC, | ) | |
| | ) | |
| Defendant, | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Paul Flick, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Timothy Willett and Willett Exterior Services LLC ("WES") brought this action against Window Gang, LLC ("Window Gang") and Paul Flick, alleging a range of contract and tort causes of action, including actual and constructive fraud, negligence *per se*, and breach of contract. (Dkt. 1.) Window Gang later filed counterclaims against Counterclaim-Defendants Willett and WES for breach of a franchise agreement, unjust enrichment, quantum meruit, and violations of state and federal trade secret laws. (Dkt. 21.) This matter is before the court on Counterclaim-Defendants' motion to dismiss Counts II through V of Window Gang's

counterclaims for failure to state a claim upon which relief can be granted. (Dkt. 22.) For the following reasons, the court will grant in part and deny in part the motion to dismiss.

## I.    Background

### A. Factual History[1]

Window Gang is a company that operates a "nationwide franchising network" for interior and exterior window cleaning services. (First Am. Countercls. ¶ 7 (Dkt. 21) [hereinafter "Countercls."].) Specifically, Window Gang "franchises its established business system" to its network of franchisees by providing "specifications regarding equipment, recommended tools, promotional materials, bidding and service delivery methods, sales procedures, job quality standards, and service marks." (*Id.* ¶ 1.) The franchisees use Window Gang's registered names, marks, and logos. (*Id.* ¶ 7.) They also commit to operating their franchises according to the specifications in Window Gang's confidential and proprietary "operations manual." (*Id.*) Finally, Window Gang manages a "consolidated call center system" that collects customer information, then conveys these customer preferences and leads to franchisees to help them provide services in a certain area. (*Id.* ¶ 8.) Window Gang has "expended substantial time, effort, and money to build and develop its brand and reputation" associated with its network of franchisees and business system. (*Id.* ¶ 7.)

On May 20, 2024, Willett executed an agreement with Window Gang ("the Franchise Agreement"). (*Id.* ¶ 9; *see* Dkt. 21-1.) The Franchise Agreement authorized Willett to operate a Window Gang franchise for a ten-year period, but only within a specified "Protected

---

[1] The facts in the following section are taken from Window Gang's First Amended Counterclaims, (Dkt. 21), and are assumed to be true for purposes of resolving Counterclaim-Defendants' Motion to Dismiss, (Dkt. 22). *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Territory"—a geographic area defined by a list of zip codes.  (Countercls. ¶¶ 9–10; Dkt. 21-1 at 5–6, 51.)  Willett's territory encompassed Murfreesboro, Tennessee and other Nashville suburbs.  (Countercls. ¶ 10.)  Willett and Window Gang both signed the Franchise Agreement and all its accompanying addenda.  (*Id.* ¶ 11.)  In "Exhibit C-6" of the Franchise Agreement, Willett "unconditionally guarantee[d]" that he would "punctually pay and perform each and every undertaking, condition, and covenant set forth in the Franchise Agreement."  (Dkt. 21-1 at 61.)  The Franchise Agreement also specifies that, aside from limited federal law exceptions, it is generally "governed by and construed in accordance with" Virginia law.  (*Id.* at 45; Countercls. ¶ 28.)

On May 20, the same day he signed the Franchise Agreement, Willett filed Articles of Organization with the Tennessee Secretary of State to form Willett Exterior Services LLC ("WES").  (*Id.* ¶ 12.)  Several weeks later, on June 3, Willett and Window Gang signed another agreement ("the Assignment Agreement") assigning Willett's rights and obligations under the Franchise Agreement to WES.  (*Id.* ¶ 13; Dkt. 21-2 at 1.)  According to the Assignment Agreement, WES "expressly assume[d] all of the terms, covenants and conditions under the terms of the Franchise Agreement, and expressly agree[d] to be bound thereby and assumes full performance thereunder."  (Countercls. ¶ 13 (quoting Dkt. 21-2 at 1).)  Willett also committed to "unconditionally guaranty [sic] [WES's] performance" of the Franchise Agreement terms.  (*Id.*)

Willett has continued to operate his Window Gang franchise through his WES entity since June of 2024.  (*Id.* ¶ 14.)  Willett and WES also, at a later unspecified date, entered into other franchise agreements with subsidiaries of Window Gang's parent company, Premium

Service Brands.  (*Id.* ¶ 16.)  These subsidiaries—Kitchen Wise, LLC and House Doctors, LLC—offer other home services.  (*Id.*)

Since executing the Franchise Agreement in May of 2024, Willett repeatedly and publicly expressed "criticisms" and "reservations" over entering into both the Franchise Agreement with Window Gang and his agreements with the subsidiaries.  (*Id.*)  Then, in February of 2025, Counterclaim-Defendants stopped reporting revenue information and paying royalties and fees to Window Gang.  (*Id.* ¶¶ 18–20.)  Window Gang argues that this violated the Franchise Agreement, as Section 4.2 requires the franchisee to pay weekly royalties of $150.00 or six percent (6%) of gross sales, whichever is greater.  (*Id.* ¶ 17; Dkt. 21-1 at 8.)  Additionally, Section 4 requires the franchisee to report revenue information so that the royalties may be properly calculated.  (Countercls. ¶¶ 17–18; Dkt. 21-1 at 8–9.)

Section 18.1 of the Franchise Agreement prohibits franchisees from operating "competitive businesses"—defined in the Agreement as "any business operating . . . in any business which offers or sells exterior surface cleaning, restoration and protection services"— within the franchisee's designated territory.  (Countercls. ¶ 21; Dkt. 21-1 at 36.)  On Window Gang's information and belief, however, Counterclaim-Defendants have created and operated a Tennessee-based limited liability company named 5 Brothers Exterior Cleaning LLC ("5 Brothers").  (Countercls. ¶ 22.)  Window Gang believes Willett is affiliated because (1) his LinkedIn profile lists 5 Brothers, (2) the 5 Brothers business webpage "features pictures of Willett and customer reviews that directly reference him and his cleaning work," and (3) WES and 5 Brothers have registered their principal offices at the same Tennessee address, which is "a single-family home titled to Timothy Willett."  (*Id.*)

The 5 Brothers website announces that it provides "'exterior' window and cleaning services in and around Murfreesboro, Tennessee and other suburbs of Nashville, Tennessee," which overlaps with the Protected Territory delineated in the Franchise Agreement. (*Id.* ¶ 23.) Willett has used Window Gang's call center system "to funnel and re-route potential Window Gang clients" to his competing 5 Brothers business. (*Id.* ¶ 24.) Specifically, "[w]hen a potential client calls the listed number for the Counterclaim-Defendants' Window Gang franchise, Willett routinely answers and advises the callers that they have reached 5 Brothers." (*Id.*) Window Gang also alleges that, on information and belief, Counterclaim-Defendants have used confidential and proprietary information from the Window Gang business system "to establish, expand, monetize, and de-risk" 5 Brothers. (*Id.* ¶ 25.)

### B. Procedural History

On May 28, 2025, Willett and WES filed a complaint against Window Gang and Flick. (Compl. (Dkt. 1).) The complaint alleged six causes of action. (*Id.* ¶¶ 22–62.) Count I alleges actual fraud against both Defendants. (*Id.* ¶¶ 22–30.) Count II alleges constructive fraud against both Defendants. (*Id.* ¶¶ 31–36.) Count III alleges negligence *per se* against both Defendants. (*Id.* ¶¶ 37–45.) Count IV seeks the equitable remedy of rescission against Window Gang. (*Id.* ¶¶ 46–48.) Count V alleges, "in the alternative to the preceding Counts," breach of contract against Window Gang. (*Id.* ¶¶ 49–55.) Count VI alleges breach of the implied covenant of good faith and fair dealing against Window Gang. (*Id.* ¶¶ 56–62.) Willett and WES request damages of at least $320,000 plus punitive damages. (*Id.* at 11–12.) For their rescission claim, they request a declaration that the Franchise Agreement is rescinded, plus damages returning parties to the status quo. (*Id.* at 12.)

Flick and Window Gang filed separate answers to the complaint on June 23, 2025. (Dkts. 8, 9.)  They both generally denied the allegations of fraud, negligence, and other claims. (*Id.*)  On the same day, Window Gang filed counterclaims against Willett and WES.  (Dkt. 10.) Willett and WES filed a motion to dismiss the counterclaims on July 14, 2025.  (Dkts. 15, 16.)

On August 4, 2025, Window Gang filed its "First Amended Counterclaims," amending its initial counterclaims as a matter of course.  (Countercls.); *see* Fed. R. Civ. P. 15(a)(1).  In this operative pleading, Window Gang alleges five total causes of action against Willett and WES: breach of franchise agreement (Count I), unjust enrichment (Count II), quantum meruit (Count III), violation of Virginia Uniform Trade Secrets Act ("VUTSA") (Count IV), and violation of the Defend Trade Secrets Act ("DTSA") (Count V).  (Countercls. ¶¶ 29–59.) Window Gang asks for a preliminary injunction preventing Counterclaim-Defendants from "engaging in additional misconduct," which includes operating a franchise "in violation of the restrictive covenants" and "prevent[ing] disclosure of trade secrets."  (*Id.* ¶¶ 60–64.)  Window Gang also requests compensatory damages of $112,600, various fees, and punitive damages of $350,000.  (*Id.* at 16–17.)

Two weeks later, Willett and WES filed a motion to dismiss the amended counterclaims, (Dkt. 22), and a memorandum in support, (Mem. in Supp. of Mot. to Dismiss First Am. Countercls. (Dkt. 23) [hereinafter "CC-Defs.' Br."]).  After the court granted parties' joint motion for extension of time, (Dkts. 26, 27), Window Gang filed their response in opposition to the motion to dismiss, (Opp. to Mot. to Dismiss First Am. Countercls. (Dkt. 28) [hereinafter "WG's Br."].)  On September 16, Willett and WES filed a reply brief in support

of the motion to dismiss.  (Reply Mem. in Supp. of Mot. to Dismiss (Dkt. 29) [hereinafter "CC-Defs.' Reply Br."].)

## II.    Standard of Review

When counterclaims are challenged in a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, they are "treated like any other claim" in a complaint, and "the same standards apply." *Rsrv. at Winchester I, LLC v. R 150 SPE, LLC*, No. 3:21-cv-00008, 2022 WL 2161518, at *3 (W.D. Va. June 15, 2022) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).  Motions to dismiss for failure to state a claim under Rule 12(b)(6) test the legal sufficiency of the claims.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  Accordingly, these motions do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)).

To survive a Rule 12(b)(6) motion to dismiss, "a complaint (or counterclaim, as is the case here) must contain sufficient facts to state a claim that is 'plausible on its face.'" *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the counterclaim-plaintiff "pleads factual content that allows the court to draw the reasonable inference that the [counterclaim-]defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When reviewing a Rule 12(b)(6) motion, "a court must consider the factual allegations in the [counterclaims] as true and draw all reasonable inferences in favor of the" counterclaim-plaintiff.  *Bing*, 959 F.3d at 616; *see E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.  The court

may also consider documents that are attached to the complaint as exhibits.  *See* Fed. R. Civ.

P. 10(c); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).

### III.    Analysis

### A.  Unjust Enrichment and Quantum Meruit (Counts II & III)

Counterclaim-Defendants first argue that Counts II and III must be dismissed because

quasi-contractual causes of action are unavailable when an express contract governs the claims

at issue.  (CC-Defs.' Br. at 1–3.)  Under Virginia law,[2] the existence of "an express contract

defining the rights of the parties necessarily precludes the existence of an implied contract of

a different nature containing the same subject matter."  *S. Biscuit Co. v. Lloyd*, 6 S.E.2d 601, 606

(Va. 1940).  In other words, a plaintiff cannot simultaneously recover in quasi-contract—

including quantum meruit and unjust enrichment theories—and in contract.  *See Colonna's

Shipyard, Inc. v. Coastal Cement Corp.*, No. 2:22-cv-00395, 2023 WL 3321734, at *3 (E.D. Va.

May 9, 2023).

However, district courts in the Fourth Circuit have consistently held that a plaintiff is

not barred from pleading an unjust enrichment claim in the alternative "where the existence

of a contract concerning the subject matter is in dispute."  *Power Home Solar, LLC v. Sigora

Solar, LLC*, No. 3:20-cv-00042, 2021 WL 3856459, at *13 (W.D. Va. Aug. 30, 2021); *see Eagle

Paper Int'l, Inc. v. Cont'l Paper Grading Co.*, 726 F. Supp. 3d 541, 552 (E.D. Va. 2024) ("This

prohibition on dual recovery does not preclude a plaintiff from pleading equitable theories of

relief as alternatives to contract recovery." (cleaned up)); *Com. & Indus. Ins. Co. v. Advance Tech.,*

---

[2] Both parties state that Virginia law governs this issue.  (*See* CC-Defs.' Br. at 2; WG's Br. at 3–4 (citing cases applying Virginia law).)  *See Vanderhoof-Forschner v. McSweegan*, 215 F.3d 1323, 2000 WL 627644, at *2 n.3 (4th Cir. 2000) (unpublished table opinion) ("Where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." (cleaned up) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997))).

*Inc.*, No. 4:09-cv-00027, 2009 WL 10688418, at *1 (E.D. Va. Oct. 7, 2009) ("Because the issue of whether the contract governs the pleadings is not firmly resolved, the Court finds that it would be premature to dismiss Plaintiffs' quantum meruit and unjust enrichment claims at this stage of the case."); *Chubb & Sun v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 678 (D. Md. 2013); *Swedish Civ. Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002); *see also* Fed. R. Civ. P. 8(d)(2) (permitting a party to plead claims in the alternative).

Window Gang specifically pleads its unjust enrichment and quantum meruit counts "in the alternative." (*See* Countercls. ¶ 35 ("In the event that the Franchise Agreement is found to be invalid, void, voidable, modified, . . . Counterclaim-Plaintiff alleges *in the alternative* that Willett would be unjustly enriched . . . ." (emphasis added)); *id.* ¶ 40 ("If the Franchise Agreement is found to be void or of no effect, Counterclaim-Plaintiff alleges *in the alternative* that it is entitled to recover the value of the services and property used by Counterclaim-Defendants . . . ." (emphasis added)).) "[T]he rationale for alternative pleading disappears when neither party contests the applicability or validity of the contract." *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 810 (E.D. Va. 2017). But here, Counterclaim-Defendants have challenged both the validity and enforceability of the contract in their complaint by asking that the Franchise Agreement be rescinded, deemed "void *ab initio*," and given "no further force and effect." (Compl. ¶¶ 46–48; *id.* at 12.) Counterclaim-Defendants do not dispute that they have challenged the Franchise Agreement's validity.

Instead, Counterclaim-Defendants argue that because franchise agreements must be in writing to be enforceable, Window Gang may not plead quasi-contractual claims in the

alternative.  (CC-Defs.' Reply at 2–3.)  The court does not agree.  The Federal Franchise Rule

does require a franchisor to, among other things, provide potential franchisees with a

"disclosure document summariz[ing] certain provisions of the franchise agreement and other

information in plain language."  16 C.F.R. § 436.5(w).  However, this regulation does not

foreclose the possibility of recovering in quasi-contract based on a franchise agreement

dispute.  *See, e.g., AFC Franchising, LLC v. Fairfax Fam. Prac., Inc.*, No. 1:18-cv-01356, 2019 WL

8112893, at *3 (E.D. Va. Jan. 24, 2019) (allowing an unjust enrichment claim based on a

dispute arising from a franchise agreement to survive a motion to dismiss); *JTH Tax, Inc. v.

Williams*, 310 F. Supp. 3d 648, 658–59 (E.D. Va. 2018) (denying motion to dismiss an unjust

enrichment claim alleging that defendant benefitted by "continu[ing] to operate the franchises

after termination of the franchise agreement"); *see also Maier v. Hendrickx*, 36 Va. Cir. 283, 1995

WL 1055848, at *2–3 (1995) ("If an express contract is unenforceable (for example, because

of the application of the statute of frauds), the plaintiff may proceed under a theory of contract

implied at law or 'quasi contract.'").  Counterclaim-Defendants provide no cases where a court

has held that parties' failure to meet the Federal Franchise Rule or a comparable writing

requirement bars them from pleading claims under unjust enrichment and quantum meruit in

the alternative.

Counterclaim-Defendants also cite *360 Painting, LLC v. Misiph*, No. 3:22-cv-00056,

2023 WL 4533932 (W.D. Va. July 13, 2023), for the proposition that the Franchise Agreement

must preclude any quasi-contract claims because Window Gang's asserted damages "arise

solely from the written agreement itself."  (CC-Defs.' Reply at 2–3.)  However, that case was

distinct from the one at hand because the court had already analyzed the validity of the contract

and concluded that "the Franchise Agreement and attached Addendum comprise of a valid enforceable contract between the parties." *360 Painting*, 2023 WL 4533932, at *4–5. Here, the court does not yet determine the validity or enforceability of the Franchise Agreement because, although Willett and WES assert that it is void *ab initio* in their initial complaint, they do not move to dismiss Window Gang's counterclaims on such grounds, and the issue is not properly before the court. Furthermore, *360 Painting* is dissimilar from this case because the Addendum at issue explicitly waived the plaintiff's right to damages. *Id.* at *5. Accordingly, the court reasoned that the plaintiff brought the quasi-contractual claims in an effort to "circumvent its express contractual agreement." *Id.* at *5. Counterclaim-Defendants neither point to similar language in the Franchise Agreement nor argue that Window Gang waived its right to damages.

Because the validity and enforceability of the Franchise Agreement remain in dispute, Window Gang's acknowledgement of such an express contract between the parties does not preclude it from pleading unjust enrichment and quantum meruit claims in the alternative at this stage. Counts II and III will not be dismissed.

## B. Trade Secrets Claims (Counts IV & V)

To assert a claim under the federal Defend Trade Secrets Act, a plaintiff must allege that: "(1) it owns a trade secret, (2) the trade secret was misappropriated, and (3) the trade secret implicates interstate or foreign commerce." *Power Home Solar, LLC*, 2021 WL 3856459, at *23. Similarly, the Virginia Uniform Trade Secrets Act requires a plaintiff to establish that (1) the information in question constitutes a trade secret, and (2) the defendant misappropriated the trade secret. *Id.* Counterclaim-Defendants argue that Window Gang's

VUTSA and DTSA claims should be dismissed because Window Gang neither "identif[ies] any specific trade secrets with sufficient particularity" nor "plausibly allege[s] unauthorized use or misappropriation." (CC-Defs.' Br. at 1.)

1. Existence of a Trade Secret

Under VUTSA, a "trade secret" is defined as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process," that both (1) "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code Ann. § 59.1-336. DTSA uses an almost identical definition of "trade secret." *See* 18 U.S.C. § 1839(3) (defining trade secret as various forms of information that the owner "has taken reasonable measures" to keep secret, and that "derives independent economic value" from not being "generally known to" and "readily ascertainable" by "another person who can obtain economic value from the disclosure or use of the information").

District courts in the Fourth Circuit have repeatedly held that the claimant must describe "the information constituting trade secrets" with some level of "specificity" to survive a motion to dismiss. *Power Home Solar*, 2021 WL 3856459, at *9 (collecting cases); *see also Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025) ("At the pleading stage, identifying the trade secret with sufficient particularity [for DTSA] means describing the trade secret at a level of detail that enables a defendant to delineate that which he is accused of

misappropriating, and that enables a court to determine whether the plaintiff has plausibly satisfied the reasonable secrecy and independent economic value requirements." (cleaned up)).

Where courts have found sufficient facts to state a VUTSA or DTSA claim for relief, the claimant "provide[d] factual descriptions" of the documents, software, products, technology, or other purported trade secrets. *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853 (E.D. Va. 2018) (finding trade secrets were adequately alleged where the complaint contained "factual descriptions of the breached documents including their relation to its technological development for robotic satellite assembly, system engineering, and research and development"); *see Darton Env't, Inc. v. FJUVO Collections, LLC*, 332 F. Supp. 3d 1022, 1037 (W.D. Va. 2018) (finding that plaintiff plausibly alleged trade secret technology where it stated (1) that the "technology is a significantly less labor-intensive and less costly means of refining" than defendants' approach and (2) that parties negotiated for plaintiff to build the technology for a defendant); *Hawkins v. Fishbeck*, 301 F. Supp. 3d 650, 657 (W.D. Va. 2017) (finding the complaint sufficiently pled trade secrets "by describing various facets of the software and related products" and showing the "confidentiality and non-compete agreements in their employment agreements" (cleaned up)). On the other hand, VUTSA and DTSA claims are dismissed where the claimant "never describes or explains what the information is and how the company derives economic value from it." *Power Home Solar*, 2021 WL 3856459, at *10.

The "trade secrets" that Window Gang claims Willett and WES misappropriated are its: (1) "flat-rate job pricing formula and bidding software," (2) "proprietary customer relationship management and lead-tracking system (including compiled lead lists and data

enhancements from its call center),” (3) “specialized marketing strategies and materials,” and (4) “confidential brand operations manual (the Brand Standards Manual) containing detailed information and processes and other confidential and proprietary information.”  (Countercls. ¶¶ 44, 53.)  At first glance, this list of trade secrets resembles the lists provided by the claimants and ultimately dismissed by this court as insufficient in *360 Painting* and *Power Home Solar*.  *See 360 Painting*, 2023 WL 4533932, at *7 (alleging trade secrets of “customer lists, pricing information, proprietary formulas, business leads, marketing materials, business and operations manuals, financial information, strategic marketing research, sales techniques, business methods, and other confidential and proprietary information”); *Power Home Solar*, 2021 WL 3856459, at *9–10 (alleging trade secrets of “[plaintiff] PHS’s ‘Solar Edge’ proprietary training, PHS’s proprietary practices, methods, techniques, and pricing models, confidential customer database, including the entire PHS’s SalesForce database, and PHS proprietary quote software, confidential sales memos, sales training manuals, and information concerning [plaintiff’s] relationship with its suppliers and vendors”).

Like the trade secrets alleged in those cases, Window Gang’s “specialized marketing strategies and materials” and “Brand Standards Manual” are not bolstered by factual allegations that, taken as true, would raise a plausible inference that they are protectable as trade secrets.  (Countercls. ¶¶ 44, 53.)  Window Gang does not offer “specific factual detail” that sheds light on how its marketing materials or manual “were developed and why the underlying [] information is not otherwise readily ascertainable by their competitors in the relevant market.”  *Power Home Solar*, 2021 WL 3856459, at *10 (citing *Art & Cook, Inc. v. Haber*, 416 F. Supp. 3d 191, 195–96 (E.D.N.Y. 2017)).  Instead, Window Gang relies on the labels of

"proprietary" and "confidential," without alleging what the information is or how the company derives economic value from it. (*See* Countercls. ¶¶ 44, 53 (noting only that the Brand Standards Manual contains "detailed information and processes and other confidential and proprietary information").) Thus, the court will dismiss Counts IV and V insofar as they allege VUTSA and DTSA violations based on Window Gang's "specialized marketing strategies and materials" and "confidential brand operations manual." (*Id.*)

However, for the other two alleged trade secrets—the "flat-rate job pricing formula" and "lead-tracking system," including leads from the call center, (*id.*)—Window Gang does more than "merely label[]" the information as confidential trade secrets. *Power Home Solar*, 2021 WL 3856459, at *10. Window Gang provides more detail as to the "unique nature" of the pricing formula, including how it gives Counterclaim-Defendants and franchisees a competitive advantage because it "allows franchisees to perform flat-price bids, which generally provide larger profit margins than jobs done on a T&M (time and materials) basis." (Countercls. ¶¶ 44, 53.) Window Gang also provides insight into how the formula, which is "unique to Window Gang's business system," was developed and refined by analyzing over a decade of commercial data, and is not "used," "known," or "readily ascertain[ed]" by "competitors in the window-cleaning industry." (*Id.* ¶¶ 45, 54.)

Counterclaim-Defendants argue that Window Gang "does not allege in any detail how this supposedly secret pricing method for flat-price bids . . . is confidential."[3] (CC-Defs.' Br. at 5.) In response, as evidence of reasonable efforts to maintain secrecy, Window Gang cites

---

[3] Counterclaim-Defendants also mention that the flat-price method is "commonplace in the window cleaning market." (CC-Defs.' Br. at 5.) The court will not consider this assertion, as Counterclaim-Defendants seek to introduce facts not contained in the counterclaim pleadings. *See Darton Env't*, 332 F. Supp. 3d at 1037–38.

the Franchise Agreement's language prohibiting franchisees from "directly or indirectly disclosing or publishing, or copying or using for such party's own benefit, or for the benefit of any other party, the Franchisor's proprietary or confidential information." (WG's Br. at 7 (quoting Dkt. 21-1 at 37) (cleaned up); Countercls. ¶¶ 46, 55 (describing how Window Gang "assign[s] penalties to the unauthorized use or distribution" of the trade secrets in the Franchise Agreement and "restricts access . . . through strict confidentiality agreements and security measures").) This court has previously relied on similar "confidentiality and non-compete agreements" to find that a plaintiff sufficiently pled that it took reasonable measures to keep the information secret. *See Hawkins*, 301 F. Supp. 3d at 657. And while Window Gang *could* have provided more detail in its counterclaims about how it protects its pricing formula, Rule 8(a)(2) does not necessitate a high level of specificity or "detailed factual allegations." *Twombly*, 550 U.S. at 555. Assuming the alleged facts are true and drawing all reasonable inferences in favor of Window Gang, the First Amended Counterclaims sufficiently allege that the pricing formula constituted a trade secret under VUTSA and DTSA.

As for the call center and lead-generating system, Window Gang describes how the purported trade secrets are developed: the system "gathers leads, job information, and preferences for potential customers requesting services that could be provided by a Window Gang franchisee within a particular service area." (Countercls. ¶ 8.) The First Amended Counterclaims emphasize the "material advantage" and economic value of these leads, as the call center is catered to the franchisee service areas and provided only to Window Gang's franchisees. (*Id.* ¶¶ 8, 47, 55; WG's Br. at 7.) Additionally, similar to the flat-rate pricing formula, Window Gang has adequately alleged reasonable efforts to keep secret the leads

generated by the call center through its contractual confidentiality and non-compete provisions.  (*See* Countercls. ¶¶ 46, 55); *Darton Env't*, 332 F. Supp. 3d at 1037–38.

### 2. Misappropriation

Counterclaim-Defendants also challenge the VUTSA and DTSA claims on the ground that Window Gang does not "plausibly allege unauthorized use or misappropriation."  (CC-Defs.' Br. at 1.)  However, their motion to dismiss only seems to dispute the misappropriation element as to the general marketing materials and Brand Standards Manual rather than the call center system and pricing formula.  In fact, Counterclaim-Defendants expressly recognize Window Gang's allegations that 5 Brothers has used both the pricing formula *and* the call center.  (*Id.* at 6 ("Window Gang alleges that another business Willett owns called 5 Brothers therefore had access to Window Gang's trade secrets, but Window Gang never identifies what supposed actual trade secrets 5 Brothers supposedly used, *other than flat-price bidding and the alleged use of a customer call center . . . .*" (emphasis added)).)

Under both VUTSA and DTSA, misappropriation is defined as the "acquisition," "disclosure," or "use" of a trade secret by "improper means," or without express or implied consent.  18 U.S.C. § 1839(5); Va. Code Ann. § 59.1-336.  Window Gang clearly alleges that the Counterclaim-Defendants have disclosed the call center leads to 5 Brothers and used the pricing formula for 5 Brothers without Window Gang's consent:

> When customer leads came in through Window Gang's confidential call center system, Willett and WES diverted those leads to 5 Brothers, using Window Gang's customer list and lead-tracking software for the new business's gain. Willett and WES also applied Window Gang's proprietary pricing formula and bidding tools in providing quotes to 5 Brothers' customers.  By transferring and using these confidential resources in 5 Brothers (which had no franchise agreement with Window Gang), Willett and WES disclosed Window Gang's trade secrets to an unauthorized entity.

(*See* Countercls. ¶¶ 47, 56.)

Accordingly, the court will not dismiss Counts IV and V to the extent that they allege misappropriation of Window Gang's pricing formula and call center system plus the associated leads. However, the VUTSA and DTSA claims will be dismissed insofar as they allege that the other marketing materials and the Brand Standards Manual are trade secrets.

## C. Request for Injunctive Relief

Federal Rule of Civil Procedure 65(a) authorizes courts to issue preliminary injunctions. "A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The court may grant a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A preliminary injunction is "never awarded as of right." *Id.* at 24. To obtain a preliminary injunction, the plaintiff must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm without preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20. All four factors must be fulfilled to justify a preliminary injunction. *Id.*

Window Gang does not file a motion for a preliminary injunction. Rather, in its First Amended Counterclaims filing, it seeks "injunctive relief" and requests that "Counterclaim-Defendants [be] preliminarily enjoined from engaging in additional misconduct." (*See* Countercls. ¶¶ 60–64.) Some courts have declined to consider a party's request for a preliminary injunction absent a separate motion for preliminary injunction and accompanying evidence. *See, e.g.*, *J.J. Crewe & Son, Inc. Profit Sharing Plan v. Talbot*, No. CIV.A. ELH-11-2871,

2012 WL 1994778, at *1 n.1 (D. Md. June 1, 2012) ("Although plaintiffs requested issuance of a preliminary injunction in the *ad damnum* clause of their Complaint, they did not file a separate motion for a preliminary injunction, nor have they submitted any evidence or argument to demonstrate their satisfaction of the standards for preliminary injunctive relief. Accordingly, I have not considered their request for injunctive relief." (citation omitted)); *Smith v. S.C. State Election Comm'n*, 901 F. Supp. 2d 639, 643 (D.S.C. 2012) (noting that when plaintiffs filed an amended complaint seeking a temporary restraining order and permanent injunction, "the court entered an order explaining that the court would not act until . . . Plaintiffs file a properly supported motion").  But because Window Gang has supplied several arguments under the *Winter* factors—albeit brief ones—in its counterclaims and opposition brief, the court will consider whether the request for preliminary injunctive relief should be dismissed. *See Damisa v. Nationwide Advantage Mortg.*, No. 2:13-cv-00590, 2014 WL 12527478, at *5 (E.D. Va. Apr. 4, 2014) (considering whether a preliminary injunction is appropriate based on a plaintiff's request in a complaint and defendants' motion to dismiss rather than a separate motion for preliminary injunction).

For the requisite showing of irreparable harm, Window Gang contends that without a preliminary injunction, it will be "irreparably harmed in the marketplace by the loss of its confidential information," (*id.* ¶ 62), as Counterclaim-Defendants are "operating 5 Brothers as a direct competitor of Window Gang" and "at least potentially continuing to operate using the leads generated by Window Gang's call center and Window Gang's flat fee formula," (WG's Br. at 12).  Window Gang also points to language in the Franchise Agreement for the proposition that "*any* breach of the confidentiality or non-compete covenants would cause

- 19 -

irreparable harm to Window Gang." (Countercls. ¶ 64 (emphasis added).) This court is not persuaded. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Instead, a claimant must show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 21–22. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended" absent a preliminary injunction, "are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (cleaned up)). And "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Comm'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

Window Gang has not alleged sufficient facts or provided evidence to show that it is entitled to the "extraordinary and drastic" remedy of a preliminary injunction. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). First, the mere existence of a Franchise Agreement provision recognizing Window Gang's entitlement to an injunction when a franchisee breaches certain provisions is insufficient to show irreparable harm or a need for a preliminary injunction under Rule 65. This contractual provision—drafted by the parties before the alleged breach and consequent harm in this case even occurred—makes a sweeping prediction that irreparable harm will occur "in the event of the [franchisee's] actual or threatened breach" of the Franchise Agreement's restrictive covenants. (Dkt. 21-1 at 36.)

Instead, Window Gang must show the *actual* harm that it suffered or will likely suffer without a preliminary injunction.

Window Gang also relies on the vague assertion that Counterclaim-Defendants will "at least potentially continu[e] to use" its confidential information. (WG's Br. at 12.) Without more detail as to the risk of continued use, this alleged harm is "remote [and] speculative," rather than "actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). And even if this harm is sufficiently imminent, Window Gang does not clearly show that an eventual award of money damages would not suffice as compensation. Although Window Gang makes conclusory statements about the inadequacy of remedies at law and the impossibility of calculating Window Gang's "substantial" losses from Counterclaim-Defendants' alleged violations, (Countercls. ¶¶ 62–63), it does not proffer any evidence of a "permanent loss of customers," "loss of goodwill," or other imminent risks of injury that are not compensable by money damages. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (citation omitted); *cf. Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 272, 278 n.7 (4th Cir. 2025) (finding irreparable harm following employees' breach of a confidentiality agreement where plaintiff "identified millions of dollars transferred in the weeks following defendants' announcement" representing "lost goodwill, lost customer trust and damage to reputation"). Here, Window Gang does not point to any lost customers or other indicators that would lead the court to believe that it is soon to suffer these irreparable injuries.

Lastly, Window Gang does not clearly show that the balance of equities tips in its favor or that an injunction is in the public interest. In arguing that the balance of equities weighs in

its favor, Window Gang once again cites the Franchise Agreement language stating that the "Franchisor shall be entitled to an injunction" "in the event of the actual or threatened breach of this Section." (WG's Br. at 12 (quoting Dkt. 21-1 at 36).) Window Gang does not discuss or actually weigh the potentially hardships that a preliminary injunction would place on Counterclaim-Defendants, nor does it explain why the injunction would be in the public interest. (See WG's Br. at 12 (stating only that the public interest prong is met because "it is deeply inequitable to allow Counterclaim-Defendants to benefit from their flagrant breaches of the Franchise Agreement and misappropriation of Window Gang's trade secrets").)

Because Window Gang does not fulfill at least three of the four *Winter* factors, its request for a preliminary injunction is denied.

## IV.    Conclusion

For the foregoing reasons, the court will grant in part and deny in part Counterclaim-Defendants' motion to dismiss. (Dkt. 22.) The court will deny the motion to dismiss as to Counts II and III. The court will grant in part and deny in part the motion as to Counts IV and V. Counts IV and V will be dismissed without prejudice to the extent that Window Gang alleges misappropriation of the "specialized marketing strategies and materials" and the "confidential brand operations manual." The remaining VUTSA and DTSA claims, based on the pricing formula and the call center lead-tracking system, may proceed. The court will also deny Window Gang's request for a preliminary injunction.

An appropriate Order will issue.

**ENTERED** this <u>2nd</u> day of March, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE